UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

UNITED STATES OF AMERICA,

    v.                                                CRIM. NO. 2:88cr76-2

JOHNEY FREEMAN,

        Defendant.

## OPINION

This matter comes before the court on Defendant's "Pro Se Motion for Sentence Reduction Under the Compassionate Release Statute, 18 U.S.C. § 3582(c)(1)(A)(i), as Amended by the First Step Act" ("Motion"). ECF No. 196.[1] For the reasons explained below, Defendant has not demonstrated extraordinary and compelling reasons justifying his release, and the factors enumerated in 18 U.S.C. § 3553(a) weigh heavily against a sentence reduction. Defendant's Motion is therefore **DENIED**.

### I. BACKGROUND

On August 16, 1988, following an eleven (11) day trial before United States District Judge J. Calvitt Clarke, Jr., of this court, a jury found Defendant guilty on Counts 1, 2, 7, 20, 27, and 40 of a 55-count, multiple defendant Indictment. Doc No.

---

[1] Filings available electronically through the court's Electronic Case Filing System are assigned "ECF" numbers; those that are not are assigned "Doc." numbers. The latter designation refers to the numbers assigned to documents in the paper case file, specifically, the record transmitted to the Fourth Circuit Court of Appeals in Case No. 88-5663.

1 (Indictment); Doc. No. 100 (verdict form). Count 1 charged Defendant with Conspiracy to Distribute and Possess with Intent to Distribute Cocaine, in violation of 21 U.S.C. § 846. Count 2 charged Defendant with Continuing Criminal Enterprise, in violation of 21 U.S.C. § 848. Counts 7, 20, 27, and 40 all charged Defendant with Distribution of Cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b) and 18 U.S.C. § 2.

On November 21, 1988, Defendant appeared for sentencing before Judge Clarke. Doc. No. 140 at 1. The court vacated Defendant's conviction on Count 1, and sentenced defendant to confinement for life plus twenty (20) years on the remaining counts of conviction. Id. at 1-2. This sentence consisted of a life term on Count 2, with concurrent sentences of twenty (20) years or less on the remaining counts, which Judge Clarke ordered to run concurrently with one another and consecutively to the life sentence on Count 2. Id. Defendant subsequently filed numerous motions either collaterally attacking his sentence or requesting a reduction in sentence, all of which were denied.[2]

Defendant filed the instant Motion, pro se, on March 4, 2021, seeking immediate release from custody to begin his term of supervised release. See ECF No. 196; ECF No. 197

---

[2] The undersigned initially served as the magistrate judge assigned to this case and assumed the case as district judge in 2003.

at 35. He moved to supplement his Motion on November 10, 2021, with additional grounds he believed justified a sentence reduction. ECF No. 211. The court granted this request and directed the United States to respond to the Motion, as supplemented, in an Order filed November 17, 2021. ECF No. 212. The United States filed its Response in Opposition on December 30, 2021. ECF No. 215. Defendant replied and submitted additional supporting medical documentation on February 28, 2022. ECF No. 223 (Reply brief and exhibits); ECF No. 224 (sealed medical documents). In response to the court's Order, ECF No. 225, the United States filed Defendant's medical records, under seal, on March 28, 2022, ECF No. 227. By letter dated May 2, 2022, and filed by the Clerk on May 6, 2022, Defendant submitted an updated Program Review noting his purported "minimum risk for recidivism and violence," current health condition, and record of prison coursework. See ECF No. 231. Having been fully briefed, the Motion is now ripe for judicial determination.

## II. EXHAUSTION

Before the court may consider a motion under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must have "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons ["BOP"]to bring a motion on the defendant's behalf," or there must have been a "lapse of 30 days from the receipt of

3

such a request by the warden of the defendant's facility." 18
U.S.C. § 3582(c)(1)(A). The Fourth Circuit has clarified that
defendants may satisfy this exhaustion requirement by "wait[ing]
30 days from the date of their initial request to file a motion
in the district court," even if the warden has already responded
to their request. United States v. Muhammad, 16 F.4th 126, 131
(4th Cir. 2021) (collecting cases). The court further clarified
that the exhaustion requirement "is a non-jurisdictional
claim-processing rule," and therefore "may be waived or
forfeited." Id. at 130.

On July 9, 2020, Defendant submitted a request for
compassionate release to the warden of his institution. ECF
No. 198-3 at 1. The warden denied this request on
August 11, 2020. Id. at 2. Because more than thirty (30) days
have passed since Defendant made his initial request, he has
satisfied the threshold exhaustion requirement. See 18 U.S.C.
§ 3582(c)(1)(A).

### III. MERITS

For a court to reduce a defendant's sentence under
§ 3582(c)(1)(A)(i), it must find that "extraordinary and
compelling reasons" justify such a reduction. The defendant
bears the burden of showing that this requirement is satisfied.
See, e.g., United States v. Newton, 996 F.3d 485, 488 (7th Cir.
2021); United States v. Noel, No. 3:08-cr-186-03, 2021 WL

4

1602402, at *2 (E.D. Va. Apr. 23, 2021) (Payne, J.). Even if a defendant carries his burden, a court may only reduce his sentence "after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A). Any such reduction must also be "consistent with applicable policy statements issued by the Sentencing Commission." Id.; see United States v. McCoy, 981 F.3d 271, 275-76 (4th Cir. 2020).

In McCoy, the Fourth Circuit held that, in the context of prisoner-filed § 3582(c)(1)(A) motions, "there currently exists no 'applicable policy statement'" because the Commission has not issued a policy statement since the passage of the First Step Act. 981 F.3d at 281-82 (alteration omitted). Therefore, until the Sentencing Commission issues an updated policy statement, "district courts are 'empowered to consider any extraordinary and compelling reason for release that a defendant might raise.'" Id. at 284 (alteration omitted) (quoting United States v. Brooker, 976 F.3d 228, 230 (2d Cir. 2020)); see United States v. Davis, No. 21-6960, 2022 WL 127900, at *1-2 (4th Cir. Jan. 13, 2022) (holding district court abused discretion in determining that certain claims "categorically" could never "establish a sufficient reason for release"). In particular, the Fourth Circuit held that courts "may consider, under the 'extraordinary and compelling reasons' inquiry, that defendants

5

are serving sentences that Congress itself views as dramatically longer than necessary or fair." McCoy, 981 F.3d at 285–86.

Whatever a defendant argues, the overarching purpose of the compassionate release mechanism guides district courts:

> When Congress authorized district courts, as a matter of discretion, to release an inmate from prison based on extraordinary and compelling reasons, it did so to introduce compassion as a factor in assessing ongoing terms of imprisonment, authorizing a district court to give greater weight to an inmate's personal circumstances – when sufficiently extraordinary and compelling – than to society's interests in the defendant's continued incarceration and the finality of judgments.

United States v. Hargrove, 30 F.4th 189, 197 (4th Cir. 2022). Ultimately, therefore, the court must "balance the severity of the inmate's personal circumstances, on the one hand, against the needs for incarceration, on the other." See id.

Although the policy statement in United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 1B1.13 is no longer binding on this court in this case after the Fourth Circuit's decision in McCoy, the court finds that certain of its provisions remain "helpful guidance" in striking this balance. See McCoy, 981 F.3d at 282 n.7. For example, the court will still consider "the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable," U.S.S.G. § 1B1.13, and whether "[t]he defendant is . . . a danger to the safety of any other person or to the community," id. § 1B1.13(2), because

6

these considerations remain highly relevant to whether a reduction in sentence is warranted in this case. In addition, "because U.S.S.G. § 1B1.13 addresses what is, in the medical context, an 'extraordinary and compelling reason' for release," the court will consider it when assessing the significance of Defendant's medical conditions. See Hargrove, 30 F.4th at 197 (quoting United States v. High, 997 F.3d 181, 186 (4th Cir. 2021).

## A. EXTRAORDINARY AND COMPELLING REASONS

Defendant contends that three (3) matters constitute "extraordinary and compelling reasons" justifying his release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i): (1) the ongoing COVID-19 pandemic, "combined with [his] age, debilitated medical condition, ethnicity and gender," ECF No. 197 at 19; (2) his "post-sentencing rehabilitation," see id. at 28; and (3) the fact that Defendant "would not receive a life sentence today" on Count 2, ECF No. 211 at 2. The court will take up the latter two arguments first, before turning to the issue of Defendant's current condition, which calls for a fuller discussion.

### 1. Life Sentence on Count 2

Just as it did when Defendant was sentenced, a conviction under 21 U.S.C. § 848 still carries a maximum statutory penalty

7

of life imprisonment.³ Despite this, Defendant submits that, for multiple reasons, he would not receive a life sentence on Count 2 today. See ECF No. 211 at 2.

The United States maintains that Defendant's arguments on this issue are not cognizable under 18 U.S.C. § 3582(c)(1)(A)(i), as they amount to an impermissible end-run of the procedural requirements for mounting a collateral attack on a federal conviction. See ECF No. 215 at 23–30; 28 U.S.C. § 2255. The Fourth Circuit has not explicitly addressed the question of whether the habeas corpus statutes cabin its holding in McCoy that, until the Sentencing Commission issues an updated policy statement, "district courts are 'empowered to consider any extraordinary and compelling reason for release that a defendant might raise.'" 981 F.3d at 284 (alteration omitted) (quoting Brooker, 976 F.3d at 230). Though the court finds the government's position convincing, and in line with a growing number of district court decisions in this Circuit,⁴ the court

_____

³ To the extent Defendant argues that he should be subject to the sentencing provisions of 21 U.S.C. § 841, he is mistaken. See ECF No. 211 at 2. Defendant's life sentence was not imposed pursuant to this statute, but rather 21 U.S.C. § 848. See Doc. No. 140 at 1.

⁴ See, e.g., United States v. Copeland, No. 2:13-cr-91, 2021 WL 3932445, at *4 (E.D. Va. Aug. 30, 2021) (Doumar, J.) ("Allowing claims historically reserved for § 2255 to fall under the umbrella of § 3582(c)(1)(A) would read into the compassionate release provisions an implicit repeal of § 2255 where no such Congressional intent can be" gleaned); United

will address Defendant's arguments on their merits, as the court can easily dispose of each.

Defendant first invokes <u>Richardson v. United States</u>, 526 U.S. 813, 815 (1999), which held that a jury must "agree unanimously about which specific violations make up the 'continuing series of violations'" necessary to sustain a conviction under 21 U.S.C. § 848. <u>See</u> ECF No. 211 at 2.[5] Defendant contends that his sentence is invalid because "the indictment did not allege a specific violation under either section 848(a) or (b)," and did not provide "notice of statutory penalty provisions" for the underlying drug offenses. ECF No. 211 at 2. However, contrary to Defendant's representation, the Indictment alleged numerous specific violations of federal drug law upon which a § 848 conviction could be based. Doc. 1 at 14 (referring to multiple other counts alleging violations of

---

States v. Ferguson, No. 3:04-cr-13-1, 2021 WL 1701918, at *4-5 (E.D. Va. Apr. 9, 2021) (Payne, J.) ("The defendant cannot proceed with a collateral attack on his sentence and thereby escape the time limitations and applicable rules for collateral attack on sentences."); United States v. Aigbekaen, Crim. No. JKB-15-0462, 2021 WL 5909680, at *3-4 (D. Md. Dec. 13, 2021) (noting that much of the defendant's motion raised collateral attacks on his sentence which were "not cognizable as grounds for compassionate release").

[5] Though certain intervening changes in law may be considered in the court's "extraordinary and compelling reasons" analysis whether they have been made retroactively applicable or not, see McCoy, 981 F.3d at 284, the court notes that the Fourth Circuit retroactively has reached the merits of Richardson claims in the § 2255 context. See, e.g., United States v. Roane, 378 F.3d 382, 397-98 (4th Cir. 2004).

Title 21). Indeed, in addition to Counts 1 and 2, the jury returned guilty verdicts on Counts 7, 20, 27, and 40, Doc. No. 100 at 1, all of which were listed in the Indictment as predicate offenses for Defendant's § 848 conviction, Doc. No. 1 at 14. This renders any alleged failure to give a jury instruction in accordance with Richardson harmless error. See United States v. Brown, 202 F.3d 691, 699-700 (4th Cir. 2000).

Defendant next contends that his life sentence resulted from impermissible judicial factfinding, prohibited by Apprendi v. New Jersey, 530 U.S. 466 (2000), and Alleyne v. United States, 570 U.S. 99 (2013). See ECF No. 211 at 2. Specifically, Defendant takes issue with the lack of a jury finding that a particular drug weight was involved in his offense, or that he, in fact, murdered three individuals. See id.

This argument misses the mark, as the life sentence Defendant received for this crime was a result of Judge Clarke's upward departure from the applicable Guidelines sentencing range pursuant to U.S.S.G. §§ 5K2.0 and 5K2.1. See Doc. No. 141 at 4-5 (sealed Statement of Reasons). He explained that this deviation "was necessary and proper because of the large amount of cocaine distributed, but more particularly because the murders of one witness and two potential witnesses resulted from the defendant's criminal activities." Id. Specifically, Judge Clarke noted that it was "clear" that Defendant "played a part in

10

accomplishing the murders." _Id._ at 5. Judge Clarke's consideration of the scope of Defendant's criminal activity, and the fact that his conduct directly caused the death of three (3) individuals, did not violate the directives of _Apprendi_ or _Alleyne_ because these findings merely informed the court's sentencing decision, which fell within the bounds of the applicable statutory sentencing range.

Indeed, as the court has previously observed, the specific quantity of drugs involved in Defendant's offense "played _no role_ in determining the guideline range or giving the upward departure for Count 2." _See_ ECF No. 103 at 1 (emphasis in original) (sealed statement of reasons denying Motion for Sentence Reduction).[6] As for the killings, the relevant Guidelines section expressly permitted the court to "increase the sentence above the authorized guideline range" if "death resulted" from Defendant's offense. _See_ U.S.S.G. § 5K2.1 (1988 ed.). That provision noted that the court was required to "give consideration to matters that would normally distinguish among levels of homicide," and was permitted to consider "whether multiple deaths resulted" from Defendant's conduct. _See id._ The current version of the Guidelines provision provides for a

---

[6] As noted above, the breadth of Defendant's criminal enterprise, including the quantity of drugs distributed, informed the court's decision. However, the upward departure was not triggered by a court finding that a particular drug weight _required_ a stiffer mandatory minimum sentence.

departure under similar circumstances. See U.S.S.G. § 5K2.1. Therefore, Defendant would be subject to the same upward departure today.

For these reasons, and to the extent they are not precluded by habeas corpus statutes,[7] none of Defendant's arguments concerning his life sentence on Count 2 justify a lesser sentence than the one he received.

### 2. Rehabilitation and Other Postconviction Conduct

Defendant argues that his rehabilitation and good behavior while incarcerated justify a sentence reduction under § 3582(c)(1)(A)(i). See ECF No. 197 at 28-30. He maintains that since his sentencing, "he has exhibited a strong commitment to rehabilitation," "has accepted responsibility for the harms caused by his actions," and has "committed himself to self-improvement and achieving a drug-free, healthy, and law-abiding lifestyle." Id. at 28.

As evidence of this improvement, Defendant points to his completion of numerous adult continuing education, release preparation, and vocational training courses while incarcerated, as well as his facilitation of a parenting course. Id. at 28-29.[8]

---

[7] See supra note 4 and accompanying text.

[8] On May 9, 2022, Defendant submitted an updated record of his coursework, demonstrating his completion of roughly thirty (30) educational, vocational, and developmental courses over the span of his incarceration. ECF No. 231 Ex. 1 at 1.

He also explains that he maintains a prison job, and that he "has established a good rapport with staff, who score his 'living skills' as 'good.'" Id. at 29; see ECF No. 223 Ex. 2 (earnings statements indicating that Defendant worked as a sewing machine operator from August 2021 through January 2022). Defendant also submitted evidence of his baptism and receipt of his ministerial license, which he explains he has used to "actively minister[] to younger prisoners." See ECF No. 197 at 29; id. Ex. 18 (certificate of ministerial license). In analyzing Defendant's Motion, the court also accepts Defendant's representation that he has not received a disciplinary infraction while incarcerated. See id. at 29.

As it assesses this evidence of postconviction conduct, the court first notes that rehabilitation, alone, does not constitute an "extraordinary and compelling reason" for a reduction in sentence. 28 U.S.C. § 994(t). But the court recognizes that it may consider rehabilitation and other postconviction conduct, when paired with other factors, as an "extraordinary and compelling reason[]" for relief. 18 U.S.C. § 3582(c)(1)(A)(i); see Davis, 2022 WL 127900, at *1 ("successful rehabilitation efforts can be considered as 'one among other factors'" (quoting McCoy, 981 F.3d at 286 n.9)). On these facts, however, Defendant's rehabilitation argument does not articulate an extraordinary or compelling reason for a

reduction in sentence in light of the full considerations herein of other matters raised by Defendant and the factors under 18 U.S.C. § 3553(a).[9]

While the court commends Defendant for taking the steps he has to improve himself, these steps are not "extraordinary." Instead, it appears to the court that Defendant has simply "do[ne] the things that prisoners are supposed to do" while incarcerated. United States v. Logan, 532 F. Supp. 3d 725, 735 (D. Minn. 2021) ("Prisoners are supposed to follow the rules, take classes, work at a job, and otherwise attempt to improve themselves. That a prisoner does so means that he has met baseline expectations, not that he has done something extraordinary.").

The court is satisfied that Defendant has met this baseline expectation over his more than three (3) decades of incarceration. Nevertheless, the court finds that Defendant's postconviction conduct, in combination with the other reasons offered, and in light the particularly disturbing nature of his offense, is not so extraordinary as to warrant a reduction in sentence.

### 3. COVID-19 and Defendant's Current Condition

Defendant argues that the "COVID-19 disaster combined with [his] age, debilitated medical condition, ethnicity and gender"

---

[9] See infra Part III.B.

14

amounts to an extraordinary and compelling reason warranting his release. ECF No. 197 at 19. Defendant describes himself as a "[68]-year-old black man who: 1) has prostate cancer; 2) suffers from diabetes; 3) is afflicted with high blood pressure/hypertension; 4) is plagued with heart problems; and 5) has high cholesterol." Id. at 20.[10] He explains that he has "continued complications" caused by his conditions, and that he "takes a plethora of daily medications just to keep him alive." See ECF No. 223 at 2.

Many of Defendant's representations align with his BOP medical records and the documents he has submitted, which indicate that he currently suffers from the medical conditions he identifies, among others. See ECF No. 227 at 244–46 (identifying current conditions as of December 28, 2021); ECF No. 224 Ex. 1 at 10 (noting that as of April 19, 2021, Defendant had a body mass index of 31.32, placing him in the category of "[o]bese grade I"). Because Defendant's conditions are "unstable" and require "complex chronic care," the BOP has designated him a Care Level 3 inmate. See ECF No. 231 Ex. 1 at 2. This category is the second most severe designation an inmate may receive, and includes "inmates who are outpatients who have complex, and usually chronic, medical or mental health

---

[10] Defendant turned 68 after he filed his Motion.

15

conditions and who require frequent clinical contacts to maintain control or stability of their condition, or to prevent hospitalization or complications."[11]

Despite this designation, a BOP Program Review generated on April 20, 2022, indicates that Defendant is cleared for regular duty and food service work, with no medical restrictions, aside from a height restriction prohibiting Defendant from climbing ladders or using an upper bunk. See ECF No. 231 Ex. 1 at 2. If released, Defendant explains he would live with his sister in McLeansville, North Carolina, and "would be supported in his reentry by his family and religious community." ECF No. 197 at 30.

In light of the conditions at FCI Butner Medium II and the comprehensive care he is receiving while in BOP custody, Defendant's circumstances do not constitute an extraordinary and compelling justification for release.

### i. Legal Standard

"Fear of COVID doesn't automatically entitle a prisoner to release." United States v. Thompson, 984 F.3d 431, 435 (5th Cir. 2021). Rather, "[i]n the context of the COVID-19 outbreak, courts have found extraordinary and compelling reasons for

---

[11] BOP, Care Level Classification for Medical and Mental Health Conditions or Disabilities at 3 (May 2019), https://www.bop.gov/resources/pdfs/care_level_classification_gui de.pdf.

compassionate release when an inmate shows both a particularized susceptibility to the disease _and_ a particularized risk of contracting the disease at his prison facility." United States v. Feiling, 453 F. Supp. 3d 832, 841 (E.D. Va. 2020) (Novak, J.) (emphasis added); see, e.g., Hargrove, 30 F.4th at 195-96, 200 (affirming order applying this standard). Thus, to demonstrate extraordinary and compelling reasons for release due to the COVID-19 pandemic, a defendant must at least demonstrate that "he is more at risk for an adverse outcome in prison than he would be if released." See United States v. Barbee, 25 F.4th 531, 533 (7th Cir. 2022). Defendant fails to make this showing.

### ii. Particularized Susceptibility

Given the comprehensive healthcare Defendant is receiving, along with his vaccination and recovery from a previous infection, Defendant is not particularly susceptible to serious illness from a future COVID-19 infection.

Defendant argues that his race places him at higher risk for a serious COVID-19 infection. ECF No. 197 at 22-23. However, "there is really no support for the proposition that 'race,' qua race, increases [a] person's risk for contracting COVID-19 or experiencing severe illness if it is contracted." See United States v. Jackson, No. 3:16-cr-6-01, 2022 WL 1178513, at *3 (E.D. Va. Apr. 20, 2022) (Payne, J.). Though "there seems to be a consensus emerging" that racial and ethnic disparities in

COVID-19 outcomes exist, they "most likely are attributable to 'social determinants of health' that 'have historically prevented' minority groups 'from having fair opportunities for economic, physical, and emotional health.'" Id. (quoting CDC, Health Equity Considerations and Racial and Ethnic Minority Groups, https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/race-ethnicity.html).

As for Defendant's sex, the court recognizes that CDC statistics suggest that men are more likely to die from a COVID-19 infection than women.[12] However, for the reasons explained below, any incremental vulnerability caused by Defendant's sex does not combine with his other risk factors to establish a particularized susceptibility to the virus.

There is evidence that Defendant's age of 68 and medical conditions increase his risk of suffering a serious infection. The CDC has observed that people over 65 are 97 times more likely to die from COVID-19 than people aged 18-29.[13] Defendant's history of prostate cancer, diabetes, hypertension, weight, and

---

[12]   CDC, Demographic Trends of COVID-19 Cases and Deaths in the US Reported to CDC, https://covid.cdc.gov/covid-data-tracker/#demographics.

[13]   CDC, People with Certain Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

heart failure point in the same direction.[14] Indeed, the CDC has explained that each of these conditions may place Defendant at greater risk of suffering a serious COVID-19 infection, and that a "person's risk of severe illness from COVID-19 increases as the number of underlying medical conditions they have increases."[15]

However, the ongoing treatment Defendant is receiving cuts against any argument that the BOP cannot adequately care for him, and suggests that he is not particularly susceptible to the virus. According to Defendant's medical records, staff have managed his medical problems as they arose, closely monitored his status, prescribed him medication and adjusted his prescriptions as needed, and counseled him concerning how access the appropriate care. See ECF No. 227. Indeed, Defendant has previously complained of several ailments which have resolved under BOP care. See id. at 244-250 (noting current and resolved conditions). Defendant's diabetes, anemia, high cholesterol, weight problems, and hypertension all appear to be well-controlled with medication and lifestyle modifications. See id. at 1-6 (medications); id. at 244-46 (diagnosis status notes); id. at 213 (noting that Defendant's weight is trending

---

[14] See supra note 13.

[15] See supra note 13.

downward from 208 pounds in April 2021 to 196 pounds in July of
that year).

It also appears that the BOP is providing the specialized
treatment demanded by Defendant's most serious diagnoses. For
example, while incarcerated, Defendant battled prostate cancer,
for which he received radiation therapy in 2018. See id. at 139.
He is receiving ongoing care from an oncology specialist to
monitor his status. Id. at 56 (provider notes from
September 30, 2021, noting "lifetime need for follow up" and
that the next visit would occur in six (6) months); id. 139
(noting that Defendant is followed by a radiation oncologist).
This care includes regular testing of Defendant's levels of
prostate-specific antigen ("PSA"). See, e.g., id. at 37. PSA
measurement "is used as a screening test for prostate cancer,"
and elevated PSA levels may be an indicator of this condition.
See Prostate-Specific Antigen, Dorland's Illustrated Medical
Dictionary (33d ed. 2020). Providers have also prescribed
medication to help manage Defendant's prostate problems. ECF
No. 227 at 2. BOP treatment has apparently been successful, as
Defendant's PSA level "continues to decline . . . ." Id. at 139
(April 16, 2021, provider notes).

Providers have treated Defendant's heart conditions with
similar thoroughness. Defendant was diagnosed with hypertension
in 2012, which is now "well controlled" with medication. Id.

20

at 244. He was also diagnosed with heart failure in April 2021. Id. at 245. The following month, BOP staff arranged for Defendant to undergo surgery, during which a stent was placed to address his condition. See id. (noting stent placement); id. at 393-94 (May 27, 2021, surgical notes describing "excellent result"). Staff also noted in April 2021 that Defendant was potentially suffering from "COVID related viral myocarditis," though subsequent imaging later ruled this diagnosis out. Id. at 108, 410 (April 21 and 29, 2021 provider notes identifying potential issue); id. at 388 (cardiologist note explaining that "it seems [Defendant's] symptoms started subtly [sic], long before he contracted COVID"); id. at 329 (imaging results noting no "findings to suggest myocarditis").[16] On the whole, it appears that the BOP has consistently provided Defendant the specialized cardiology care needed to manage his heart conditions.

Still, Defendant's heart condition has necessitated at least two emergency room visits following his stent placement. See id. at 8-18 (noting December 18, 2021, visit for shortness

---

[16] These findings demonstrate that the BOP investigated Defendant's claims of lingering COVID-19 symptoms from his April 2021 infection, which appear unsupported by the medical record. See ECF No. 227 at 18 (December 18, 2021, provider notes explaining that Defendant was "complaining of worsening [shortness of breath] since" his April 2021 COVID-19 infection); id. at 388 (noting that during a visit with a cardiologist in May 2021, Defendant explained that he felt he was "over his COVID symptoms" and that he "has been experiencing dyspnea since 2020").

of breath); id. at 48 (noting emergent transport "for chest pain with elevated troponin" on September 30, 2021). Provider notes entered on December 19, 2021, following his most recent emergency room visit, explain that he returned to "his baseline [shortness of breath]," "walked without assistance," and that his elevated troponin level had subsided. See id. at 11, 15. In addition, Defendant's January 2022 prison employment pay stub indicates that he was able to work as a sewing machine operator following this episode. See ECF No. 223 Ex. 2 at 2 (noting that Defendant worked 66.8 hours in January 2022). Although Defendant's heart conditions are serious, his medical and work records demonstrate that his ailments are well managed at FCI Butner Medium II.

The comprehensive care Defendant is receiving is an important aspect of Defendant's protection from an adverse COVID-19 outcome. Yet, Defendant has made no showing that he would receive similar treatment outside of BOP custody. This weakens any argument that "he is more at risk for an adverse outcome in prison than he would be if released." Barbee, 25 F.4th at 533.

Defendant's vaccination also weakens his argument. Defendant has received two doses of the highly effective

22

Pfizer-BioNTech COVID-19 vaccine. ECF No. 227 at 255.[17] Though he correctly points out that vaccination "does not eliminate" an individual's potential for becoming seriously ill from a COVID-19 infection, ECF No. 223 at 3, inoculation exponentially decreases his risk. The CDC has observed that fully vaccinated adults 65 and older "had a 94% reduction in risk of COVID-19 hospitalizations . . . ."[18] Though the court recognizes that "breakthrough" infections are possible, despite his age and medical conditions, Defendant's inoculation vastly decreases his chances of suffering severe complications if he does ultimately become infected again in the future. See, e.g., United States v. Sanders, No. CR SAG-06-087, 2021 WL 1428546, at *3 (D. Md. Apr. 15, 2021) (holding that defendant's "vaccination status remove[d] his other medical conditions from the category of risk constituting an 'extraordinary and compelling reason,'" and collecting cases concluding the same); United States v. Broadfield, 5 F.4th 801, 803 (7th Cir. 2021) ("[F]or the many prisoners who seek release based on the special risks created by COVID-19 for people living in close quarters, vaccines offer relief far more effective than a judicial order."); United

---

[17] CDC, Pfizer-BioNTech COVID-19 Vaccine (also known as COMI RNATY): Overview and Safety, https://www.cdc.gov/coronavirus/201 9-ncov/vaccines/different-vaccines/Pfizer-BioNTech.html.

[18] CDC, COVID-19 Risks and Vaccine Information for Older Adults, https://www.cdc.gov/aging/covid19/covid19-older-adults.html.

States v. Inman, --- F. Supp. 3d ---, 2022 WL 304660, at *4, 6 (M.D. Tenn. 2022) (finding Defendant's hypertension, constipation, gastric ulcer, alcohol use disorder, severe stimulant related disorder, pacemaker, and recent heart-valve replacement "combined with the COVID-19 pandemic" did not amount to extraordinary and compelling reasons because the defendant was vaccinated).

Defendant's quick recovery from a previous COVID-19 infection while in BOP custody also supports this inference. See ECF No. 227 at 124, 246 (noting that Defendant was placed in isolation after he tested positive on April 16, 2021, but ten (10) days later was "asymptomatic/afebrile"). When paired with the BOP's adequate provision of medical care, Defendant's successful recovery "undercuts the argument that he is particularly susceptible to extreme illness or death from COVID-19, or that the [BOP] would be ineffective in managing his illness in the off-chance he contracts COVID-19 again." See United States v. Aqid, 555 F. Supp. 3d 279, 282 (E.D. Va. 2021) (Smith, J.).

Furthermore, other than the restrictions on Defendant's climbing, see ECF No. 231 Ex. 1 at 2, the record does not indicate that Defendant's conditions currently prevent him from caring for himself in prison, see United States v. Mumford, 544 F. Supp. 3d 615, 618 (E.D. Va. 2021) (Smith, J.) (concluding

that the defendant's medical conditions amounted to "extraordinary and compelling reasons," in part, because they substantially diminished his ability to care for himself in a correctional setting). The court finds Defendant's ability to work particularly instructive. The earning statements he submitted indicate that following his stent placement, Defendant was able to work roughly 574 hours as a sewing machine operator from August 2021 through January 2022. ECF No. 223 Ex. 2 at 2-7.

In sum, the court recognizes that Defendant's age, medical conditions, and even his sex, are potential risk factors for serious illness from a future COVID-19 infection. However, given Defendant's vaccination status, the comprehensive care he is receiving,[19] his ability to care for himself while in prison, and his recovery from a previous COVID-19 infection, the court finds that Defendant's conditions are not so severe as to render him particularly susceptible to serious illness or death from

---

[19] This is not to say that Defendant has received flawless medical care. During its review of Defendant's medical records, the court noted that on at least two (2) occasions there were apparent breakdowns in communication concerning Defendant's medications. See ECF No. 227 at 359-60 (noting that Defendant should have been on additional medications); id. at 168 (noting accidental insulin administration). However, these isolated instances do not demonstrate that the BOP, as a general matter, is failing to adequately care for Defendant. Indeed, it appears that Defendant's own conduct may make accurately tracking his medications difficult. See id. at 8 (noting that upon Defendant's return from a hospital visit, he had multiple medications in unlabeled bottles, including one medication for which he has never had a prescription).

COVID-19. Instead, "it appears that the conditions on which [Defendant] bases his motion are 'chronic conditions that can be managed in prison [and thus] are not a sufficient basis for compassionate release.'" United States v. Ferguson, No. 3:04-cr-13-01, 2021 WL 1701918, at *3 (E.D. Va. Apr. 29, 2021) (Payne, J.) (quoting United States v. Ayon-Nunez, No. 1:16-cr-130, 2020 WL 704785, at *2-3 (E.D. Cal. Feb. 12, 2020)); see Hargrove, 30 F.4th at 195-98 (holding district court did not abuse discretion in finding that a defendant's evidence of asthma, high blood pressure, and sleep apnea did not establish extraordinary and compelling reasons).

### iii. Particularized Risk

Even if Defendant was particularly susceptible to COVID-19, the effect of the pandemic would not warrant his release because Defendant does not face a particularized risk of contracting the virus at his facility, FCI Butner Medium II.

Current statistics illustrate that the BOP's ongoing mitigation efforts, including widespread vaccination, have significantly reduced Defendant's risk of contracting the virus at his institution. A large number of inmates and staff at FCI Butner Medium II have been inoculated against COVID-19 with vaccines[20] shown to be effective at preventing serious COVID-19

---

[20] As of July 26, 2022, full inoculations were completed for 3,764 prisoners, and at least 1,156 staff members, at FCC

illness.[21] And as of July 26, 2022, FCI Butner Medium II had only four (4) active cases of COVID-19 among inmates and only two (2) active cases among staff members.[22]

These numbers leave the court unconvinced that residing in McLeansville, North Carolina, as Defendant plans should he be released, see ECF No. 197 at 30,[23] would afford him significantly more protection than remaining at his institution, where the BOP is actively managing operations[24] to minimize the spread of COVID-19. See Feiling, 453 F. Supp. 3d at 841-42 (denying motion for compassionate release where defendant "fail[ed] to demonstrate how his release on home confinement [would] significantly reduce his likelihood of contracting COVID-19").

---

Butner, which includes FCI Butner Medium II. BOP, COVID-19 Vaccine Implementation, https://www.bop.gov/coronavirus/.

[21] CDC, Benefits of Getting a COVID-19 Vaccine, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/vaccine-benefits.html.

[22] BOP, COVID-19 Cases, https://www.bop.gov/coronavirus/.

[23] This community is located within Guilford County. As of July 26, 2022, 62% of Guilford County residents were fully vaccinated against COVID-19. N.C. Dep't Health & Human Servs., Vaccinations Dashboard, https://covid19.ncdhhs.gov/dashboard/vaccinations.

[24] BOP, FCI Butner Medium II, https://www.bop.gov/locations/institutions/btf/ (noting modifications to prison operations due to COVID-19); BOP, COVID-19 Modified Operations Plan & Matrix, https://www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp (describing modifications).

In sum, the low prevalence of COVID-19 at Defendant's facility, particularly in light of the BOP's ongoing vaccination and mitigation efforts, does not subject Defendant to a particularized risk of contracting the virus at FCI Butner Medium II. See, e.g., United States v. Spencer, 521 F. Supp. 3d 606, 612 (E.D. Va. 2021) (Smith, J.) (denying motion where the defendant's facility had only two (2) active COVID-19 cases among inmates).

### iv. Conclusion

Defendant has not demonstrated a particularized susceptibility to COVID-19, or that he faces a particularized risk of contracting the virus at FCI Butner Medium II. Although Defendant suffers from serious medical conditions, this does not automatically entitle him to a sentence reduction. See, e.g., Inman, 2022 WL 304660, at *4, 6. Defendant has not demonstrated that the BOP is unable to adequately care for him while imprisoned, and has not explained how he will receive any of the specialized care he requires should the court reduce his sentence. He also has not demonstrated that he faces a substantially greater risk of contracting the virus at his institution than his proposed home upon release. In sum, Defendant failed to establish that "he is more at risk for an adverse outcome in prison than he would be if released," Barbee, 25 F.4th at 533, and therefore he has not shown extraordinary or

compelling reasons justifying a sentence reduction on the basis of his individual characteristics and the COVID-19 pandemic.

## B. SECTION 3553(a) FACTORS

A court may only reduce a defendant's sentence under § 3582(c)(1)(A) "after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable . . . ." 18 U.S.C. § 3582(c)(1)(A). That said, "[s]ection 3582(c)(1) permits a district court to reduce a sentence in 'any case' – not just cases where a sentence has been substantially served; not just in cases involving low-level or non-violent offenses." Kibble, 992 F.3d at 334 (Gregory, C.J., concurring) (citing United States v. Gonzales, 520 U.S. 1, 5 (1997)). Even if Defendant had presented "extraordinary and compelling reasons," the court finds that a reduction in sentence would not be proper in this case, as the § 3553(a) factors weigh heavily against Defendant's release. See Kibble, 992 F.3d at 330, 332 (majority opinion affirming denial of a motion for compassionate release where the defendant's "health conditions . . . amounted to extraordinary and compelling circumstances," but "the § 3553(a) factors counseled against a sentence reduction").

First, the court acknowledges and credits Defendant's postconviction coursework, impressive institutional disciplinary record, prison employment, and other evidence of positive

29

personal growth.[25] However, the court observes that Defendant's offense conduct was extremely serious, and that Defendant has served roughly thirty-four (34) years of a sentence of life plus twenty (20) years. Kibble, 992 F.3d at 331 (recognizing that district courts are "entitled to consider the amount of time [defendants] ha[ve] served as one factor in the § 3553(a) analysis" and citing United States v. Chambliss, 948 F.3d 691, 694 (5th Cir. 2020) and United States v. Pawlowski, 967 F.3d 327, 331 (3d Cir. 2020)). While the amount of time remaining on Defendant's sentence is not a dispositive factor, at this juncture, Defendant's steps towards rehabilitation do not outweigh the seriousness of Defendant's offense conduct that gave rise to the sentence he is serving. See, e.g., United States v. Bowser, 539 F. Supp. 3d 572, 576-77 (E.D. Va. 2021) (Smith, J.) (denying motion for compassionate release, in part, on this basis).

Defendant played a leadership role in an extensive, years-long interstate drug trafficking conspiracy. See ECF No. 214 ("Presentence Report" ("PSR")) ¶¶ 16-45. The scheme involved the shipment of at least 106 pounds of cocaine from New York to Norfolk, Virginia, where it was distributed. See id. ¶¶ 16-17, 32. Defendant "ran the Norfolk operation in [the

---

[25] See supra Part III.A.2. (discussing Defendant's postconviction conduct).

kingpin's] absence, and was deeply involved in all facets of the organization's operation." Id. ¶ 35. The coconspirators carried firearms, wore body armor, and employed relatively sophisticated surveillance and security measures to protect their operation. Id. ¶¶ 19-22.

After the operation caught the attention of law enforcement, instead of yielding to authorities, Defendant took violent steps to avoid culpability. He fired into a witness' home before the witness testified "in an effort to scare, or kill him." Id. ¶ 24. Though this attempt was unsuccessful, Defendant later facilitated the murder of this witness, along with two other potential government witnesses. See id. ¶¶ 24-27, 35. Specifically, Defendant introduced a gunman to several co-defendants, and the gunman then murdered two of the victims with firearms Defendant procured. Id. ¶¶ 24-26. Defendant transported the third victim from Virginia to New York, where she was murdered at the direction of a co-defendant. Id. ¶¶ 27, 35.

The violence Defendant perpetrated and facilitated during the commission of his crimes, paired with the extent of the interstate drug trafficking conspiracy he helped lead, weigh heavily against him. See 18 U.S.C. § 3553(a)(1). Moreover, given the nature of his offense conduct and Defendant's prior

31

crimes,[26] the court concludes that Defendant's prison sentence, as initially imposed, is not unduly harsh when compared to the sentences of similarly situated defendants. See 18 U.S.C. § 3553(a)(6).

On this record, the court is also satisfied that Defendant's sentence of life plus twenty (20) years is necessary "to reflect the seriousness of the offense, to promote respect for the law, . . . to provide just punishment for the offense," and "to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(A)-(B). Defendant has not demonstrated that alternative sentences, such as home confinement or simply beginning supervised release, would adequately promote these objectives. See 18 U.S.C. § 3553(a)(3). This remains so even though Defendant's advanced age, rehabilitation while incarcerated, and medical conditions collectively lead the court to believe that Defendant is significantly less likely to recidivate than he was when initially sentenced. See 18 U.S.C. § 3553(a)(2)(C).

---

[26] The court notes that the instant offense was not Defendant's first encounter with the law. Prior to sustaining the convictions in 1988, for which he is currently imprisoned, Defendant was convicted of Mail Theft by a Postal Employee in 1974; Criminal Sale of a Controlled Substance, Attempted Criminal Possession of a Weapon, and Petty Larceny in 1982; as well as a probation violation in 1975 and a parole violation in 1977. See PSR ¶¶ 50-56.

Granting Defendant's Motion simply would not promote the sentencing objectives aimed at preventing the type of extensive harm and deaths Defendant caused during the life of his drug trafficking operation. In sum, Defendant's sentence remains "sufficient, but not greater than necessary," to achieve the aims of 18 U.S.C. § 3553(a).

### IV. CONCLUSION

Based on the foregoing, and having considered the effect of McCoy on Defendant's sentence, all the factors under 18 U.S.C. § 3553(a), and Defendant's offense conduct, criminal history, age at the time of the offense, intervening law, current condition, and rehabilitation while incarcerated, Defendant's Motion for Compassionate Release, ECF No. 196, is **DENIED**. The Judgment entered on November 21, 1988, Doc. No. 140, remains in full force and effect.

The Clerk is **DIRECTED** to forward a copy of this Memorandum Order to Defendant, the United States Attorney, and the Bureau of Prisons.

**IT IS SO ORDERED.**

/s/

Rebecca Beach Smith
Senior United States District Judge

REBECCA BEACH SMITH
SENIOR UNITED STATES DISTRICT JUDGE

July 27, 2022

33